**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. ______________

TREAD ATHLETICS LLC,

Plaintiff,

v.

TYLER GERMANOWSKI, AARON BECHTEL, VICTOR SANCHEZ, and PRIME PERFORMANCE, LLC,

Defendants.

## PLAINTIFF'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Tread Athletics LLC ("Tread Athletics" or the "Company") files this Verified Complaint seeking injunctive relief, damages, and other appropriate remedies against Defendants Tyler Germanowski ("Germanowski"), Aaron Bechtel ("Betchtel"), and Victor Sanchez ("Sanchez"), (Germanowski, Betchtel, and Sanchez, collectively, the "Employee Defendants") for breach of contract, breach of fiduciary duty, and tortious interference with prospective economic advantage, and against Prime Performance LLC ("Prime Performance" or the "Company Defendant") for tortious interference with contractual relations and unjust enrichment.

In further support of its Verified Complaint, Tread Athletics states as follows:

## PARTIES

1. Plaintiff Tread Athletics LLC is a limited liability company organized under the laws of the State of North Carolina. All of its members are residents of North Carolina.

2. Defendant Germanowski is a resident of Virginia.

3. Defendant Bechtel is a resident of Florida.

4. Defendant Sanchez is a resident of South Carolina.

5. Prime Performance is a limited liability company organized under the laws of the State of New York, and all of its members are residents of New York.

6. Prime Performance is registered and actively conducting business in the State of Florida. Its operations include substantial activity within the state, notably the acquisition of a multi-million-dollar property located at 455 NW Enterprise Drive, Port St. Lucie, Florida 34986, which it has converted into a baseball training facility.

**JURISDICTION AND VENUE**

7. This court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

8. In particular, with respect to Plaintiff's claim for injunctive relief, Plaintiff will suffer losses far exceeding $75,000 if an injunction does not issue. *See S. Fla. Wellness, Inc. v. Allstate Ins. Co*., 745 F.3d 1312, 1315-16 (11th Cir. 2014) (ascertaining the value of injunctive or declaratory relief for amount in controversy purposes is the value of the object of the litigation measured from the plaintiff's perspective).

9. Venue is proper in this district under 28 U.S.C. § 1391(b) on the grounds that a substantial part of the events giving rise to the claims set forth in this complaint occurred in this district, Prime Performance's operations are located in this district, and the Employee Defendants operate Prime Performance in this district.

10. All conditions precedent to bringing this action have occurred, have been satisfied, or have otherwise been waived.

## BACKGROUND FACTS
## Tread Athletics' Business

11. Tread Athletics is a baseball player development company that operates primarily in a remote capacity. It specializes in throwing-specific training programs built from advanced biomechanical assessments, with the goal of helping pitchers enhance pitch performance, health and strength, and improve their long-term career outlook.

12. Since its founding in 2015, Tread Athletics has trained over 8,000 individual players worldwide, including more than 250 Major League Baseball draft picks and signees, multiple Major League Baseball All-Stars, and over 1,000 college commitments.

13. Through its online training platform, Tread Athletics has developed custom training plans for thousands of athletes, including professional players in Major League, Minor League, and international leagues, as well as collegiate, high school, and middle school athletes across all 50 states and in more than 25 countries spanning five continents. In addition to remote programming, athletes have the option to schedule in-person training sessions with their assigned coaching staff.

14. Over numerous years and through significant investments of time and money, Tread Athletics has developed systems for establishing, operating, and marketing its online training programs.

15. In so doing, Tread Athletics also has spent considerable financial resources to cultivate detailed customer lists that it maintains through its internal databases, which include specific information about its athletes such as their names, parents' name(s) and contact information, agent's names and contact information, e-mail addresses, home addresses, mobile phone numbers, social media handles, training plans, and progress notes.

16. Tread Athletics developed the proprietary information contained within its internal databases and platforms over the course of several years. To safeguard the confidentiality of this data, the Company has implemented significant protective measures, including investing millions of dollars into a custom-built web application designed to restrict visibility to only assigned athletes—excluding access to the full client list. Additionally, Tread Athletics requires all staff to sign non-disclosure agreements that prohibit the disclosure or use of the company's trade secrets and proprietary materials following the termination of employment.

17. The information contained in Tread Athletics internal databases and platforms was compiled exclusively by Tread Athletics, is not available to the public, is not readily ascertainable through proper means, and could not have been generated independently of Tread Athletics' efforts.

18. Tread's customer athletes commit to twelve months of services with the option to pay annually or in monthly installments.

19. Each customer-athlete enrolled in Tread Athletics' remote training program represents a high-value, long-term revenue opportunity. Beyond strong retention rates, these athletes contribute to multiple revenue streams, including referrals for on-site training and monetization through Name, Image, and Likeness (NIL) marketing. Additionally, the Tread Athletics Athlete Tracker—a proprietary database of customer-athletes—holds substantial standalone monetary value due to its strategic utility and exclusivity.

**Employee Defendants' Employment With Tread Athletics**

20. On or about June 3, 2023, Tread Athletics hired Bechtel as a Performance Coach.

21. On or about August 14, 2023, Tread Athletics hired Sanchez as a Performance Coach.

22. On or about August 31, 2023, Tread Athletics hired Germanowski as a Performance Coach.

23. As Performance Coaches, Employee Defendants' job duties included performing remote and in-house training with assigned athletes, preparing individualized training programs, interacting with athletes, assisting with facility operations, producing education content for use on-line and in-house, and community building, all on behalf of Tread Athletics.

24. Throughout their employment, the Employee Defendants received extensive education and training from Tread Athletics on its proprietary methods for athlete development, including remote coaching techniques, performance tracking systems, and individualized training protocols.

25. Indeed, each Employee Defendant completed "Tread-U," Tread Athletics' intensive twelve-week proprietary training program designed to equip coaches with elite-level skills and methodologies. This specialized curriculum enabled them to perform at the highest level in the baseball development industry and granted them access to the Company's most advanced systems and strategies.

26. In the course of their work, Employee Defendants gained access to Tread Athletics' trade secrets and other confidential and proprietary information, including but not limited to: Tread Athletics' Exercise Library & Program Builder, a proprietary algorithm for efficiently creating effective & efficient programming, current and prospective client data; training methodologies; athlete development strategies; marketing and sales techniques; pricing structures; and internal business models.

27. This information included detailed client lists, spreadsheets updated by Tread Athletics personnel with notes on athlete preferences and progress, strategic planning documents,

and market analysis. Employee Defendants used this training and access to confidential information to build and maintain relationships with Tread Athletics' clients—relationships that were central to the Company's goodwill and competitive advantage.

28. During their employment with Tread Athletics, Employee Defendants delivered remote baseball training services to clients across dozens of U.S. states, including New Jersey, Oklahoma, South Carolina, Texas, Michigan, Virginia, Missouri, Pennsylvania, Georgia, North Carolina, Florida, and New York. In addition to their domestic reach, the Employee Defendants also provided remote training to international clients in countries such as Australia, the Czech Republic, and Canada.

29. In addition to his responsibilities in training and coaching, Sanchez acted as a representative of Tread Athletics on various special projects. Notably, this included initiatives in Las Vegas connected to a pilot program with the University of Nevada, Las Vegas, during which Sanchez was granted direct access to collegiate coaching staff and confidential business development strategies of Tread Athletics.

30. In fact, Tread Athletics funded multiple trips for Sanchez to Las Vegas, including one on February 21, 2025—just nine days before Prime Performance filed for limited liability company status and nineteen days prior to the resignation of the Employee Defendants. Sanchez participated in the February 21 trip with full knowledge that he would be launching a competing business within weeks.

31. Prior to their employment with Tread Athletics, Employee Defendants had experience as baseball players, each having played the position of pitcher. However, none had prior experience providing remote baseball training until they began working at Tread Athletics.

32. On December 12, 2024, Germanowski met with Tread Athletics CEO and Co-Founder Coan McAlpine ("McAlpine") for Germanowski's annual performance review. During his annual performance review, Germanowski expressed strong enthusiasm for his role at Tread Athletics and repeatedly affirmed his desire to remain with the Company long-term. He highlighted his contributions beyond core coaching duties, including mentoring interns, developing internal resources, and assisting with training programs, and requested consideration for additional responsibilities based on those efforts. At no point did Germanowski indicate dissatisfaction with his position or suggest any intent to leave Tread Athletics.

33. On December 13, 2024, Betchtel met with McAlpine for his annual performance review. During his annual performance review, Bechtel expressed a strong commitment to his role at Tread Athletics and a desire to remain with the Company long-term. He acknowledged areas for improvement in his performance metrics and proactively discussed strategies to enhance athlete engagement and outcomes, particularly within the high school demographic. Bechtel emphasized his dedication to going above and beyond for his athletes and welcomed constructive feedback, showing no signs of dissatisfaction or intent to leave Tread Athletics. In his Annual Retention Survey, Bechtel also indicated that he was "very confident" in the direction of Tread Athletics.

34. On December 17, 2024, Sanchez met with McAlpine for Sanchez's annual performance review. During his annual performance review, Sanchez expressed a strong desire to grow within Tread Athletics, repeatedly affirming his long-term commitment to the Company. He discussed his goals for advancement, acknowledged the opportunities Tread had provided him, and explicitly stated that he was not seeking to leave, despite maintaining external relationships for professional networking purposes. At no point did he indicate dissatisfaction with his role or

suggest any intent to leave Tread Athletics. In his Annual Retention Survey, Sanchez also indicated that he was "very confident" in the direction of Tread Athletics.

**Employee Defendants' Confidentiality, Non-Competition and No-Solicitation Agreements with Tread Athletics**

35. On or about December 23, 2024, following their annual performance reviews, each of the Employee Defendants signed an agreement setting forth the terms of their new employment (collectively, the "2024 Agreements"). True and correct copies of the 2024 Agreements for Defendants Germanowski, Bechtel, and Sanchez are attached hereto as **Ex. 1** ("Germanowski Agreement"), **Ex. 2** ("Bechtel Agreement"), and **Ex. 3** ("Sanchez Agreement"), respectively.[1]

36. Under the 2024 Agreements, each Employee Defendant received increased compensation, benefits, and new opportunities to earn performance-based bonuses. These agreements represented a new employment arrangement, rather than a mere continuation of their prior terms.

37. Tread Athletics' promotion of the Employee Defendants gave them access to sensitive Company data, including but not limited to employment decisions and athlete data.

38. Like their prior contracts with Tread Athletics, the 2024 Agreements include certain standard confidentiality, non-competition, and non-solicitation provisions that are critical to safeguarding Tread Athletics' business.

39. In particular, each of the 2024 Agreements states:

> The Employee acknowledges that during the term of this Agreement he or she will have access to and become acquainted with various trade secrets, inventions, innovations, processes, information, records and specifications owned or licensed by the Company and/or used by the Company in connection with the operation of its business including,

[1] The 2024 Agreements are substantively identical, with the only differences being the employee's name, state of residence, and the individually tailored Exhibit A attached to each agreement.

> without limitation, the Company's business and product processes, methods, customer lists and contact information, databases, accounts, tools, equipment, and brand. The Employee agrees that he or she will not disclose any of the aforesaid, directly or indirectly, or use any of them in any manner, either during the term of this Agreement or at any time thereafter, except as required in the course of this engagement with the Company. All files, records, documents, blueprints, specifications, information, letters, notes, media lists, original artwork/creative, notebooks, login credentials and passwords, and similar items relating to the business of the Company, whether prepared by the Employee or otherwise coming into his or her possession, shall remain the exclusive property of the Company. The Employee shall not retain any copies of the foregoing without the Company's prior written permission including public-facing, Tread-associated social media accounts and content, e-resources, educational course materials, raw player or business data, hard code, models, or similar. Upon the expiration or termination of this Agreement, or whenever requested by the Company, the Employee shall immediately deliver to the Company all such files, records, documents, specifications, information, and other items in his or her possession or under his control. Specifically, the Employee is to keep confidential the systems and processes by which training programs are prepared, automated, and distributed through the 'Program Builder', 'Program Template', and 'Tread+'. All infrastructure whether abstract or finite must remain confidential.

2024 Agreements ¶ 8.

40. Each of the 2024 Agreements further states:

> For a period of one (1) year following any termination of this Agreement, the Employee shall not hire, solicit, or encourage to leave the Company's employment, any employee, consultant, athlete, client, or contractor of the Company or hire any such employee, consultant, or contractor who has left the Company's employment or contractual engagement within one (1) year of such employment or engagement.
>
> For a period of one (1) year following any termination of this Agreement, the Employee shall not solicit for remote or in-house baseball or softball training for pitching or hitting: (1) any client with whom the Employee has had employment-related contact during his or her employment; (2) any prospective client known by Employee to be a prospective client of the Company; or, (3) any client or prospective client appearing on the Company's Client/Athlete list for baseball or softball training products and services.

> The one-year period will be tolled during any time that Employee is not complying with the covenants described herein.

*Id.* ¶ 11.

41. Each of the 2024 Agreements further states:

> The Employee acknowledges that the Company has expended and shall continue to expend substantial amounts of time, money, and effort to develop business strategies, employee and customer relationships and good will, and to build an effective organization. The Employee acknowledges that the Company has a legitimate business interest in protecting such efforts. The Employee also acknowledges and agrees that in the performance of the duties and responsibilities of employment, the Employee has and will become familiar with the Company's confidential information, including trade secrets, and that the Employee's services are of special, unique, and extraordinary value to the Company. Further, the Employee acknowledges that the Company would be seriously and irreparably damaged by the disclosure of trade secrets, confidential information and/or other loss or deterioration of its business strategies, employee and customer relationships and good will. The Employee further understands and agrees that the foregoing makes it necessary for the protection of the business and the Company that the Employee does not compete with the Company during his or her employment and for a reasonable period thereafter, as further provided in the following paragraphs.

*Id.* ¶ 11.

42. Each of the 2024 Agreements further states:

> Employee agrees that during the term of this Agreement he or she will not engage in a competing business in the remote or in-person training industry as it pertains to baseball or softball training for pitching or hitting, or with any other business that can in any way be deemed a competitor of the Company.
>
> The Employee also agrees to not engage in a competing business or engage in business with a competitor in a role that is similar to the role or includes any of the employment duties and responsibilities described in Exhibit A hereto for a period of one (1) year after termination of this Agreement unless a formal waiver is granted by the Company. For the purposes of this Agreement, a "competitor" or "competing business" is defined as one that operates, in any capacity, in the remote baseball or softball training for pitching or hitting development industry worldwide or in the in-person baseball or softball training for pitching or hitting

> training industry within 30-miles of those locations where the Company maintains in-person training facilities, whether leased or owned and including facilities managed by the Company's partners. In this regard, Employee expressly acknowledges that the Company's clients include major league, minor league, independent league, college, high school, and youth baseball players in every state of the United States and in more than twenty countries, including the United States, Canada, Mexico, Korea, and Japan.

*Id.* ¶ 12.

43. Tread Athletics equipped each Employee Defendant with a dedicated business cell phone and telephone number, as well as a business laptop configured to access the Company's proprietary web-based messaging platform, specifically to facilitate communication with the Company's customer-athletes. Tread Athletics expressly prohibited the use of personal electronic devices, including personal mobile phones—for communicating with customer-athletes or storing related information. This restriction was implemented because there was no legitimate business need for such use, and it served to further safeguard the Company's confidential and proprietary information.

**<u>Employee Defendants' Resignation, Violation of Their Agreements, and Defendants' Tortious Interference</u>**

44. On March 14, 2025, at 8:50 AM, Defendant Germanowski informed Tread Athletics through email that he was resigning from his employment. *See* **Ex. 4**.

45. In discussions after Germanowski's resignation email, Germanowski represented that he was resigning from his employment to return home to Virginia to start a family and that he had no intention of working in the baseball training industry. In reliance on Germanowski's representation that he would not be acting in violation of the non-solicitation and non-compete provisions in his employment agreement, Tread Athletics agreed to terminate his employment as of March 31, 2025, even though the 2024 Agreements require 45-days' notice.

46. On March 14, 2025, at 8:50 AM, Defendant Bechtel informed Tread Athletics through email that he was resigning from his employment. *See* **Ex. 5**.

47. In discussions after Bechtel's resignation email, Bechtel represented that he was resigning from his employment to return to Kansas to care for his sick mother-in-law and that he had no intention of working in the baseball training industry. In reliance on Betchel's representation that he would not be acting in violation of the non-solicitation and non-compete provisions in his employment agreement, Tread Athletics agreed to terminate his employment as of April 4, 2025, even though the 2024 Agreements require 45-days' notice.

48. On March 14, 2025, at 8:50 AM, Defendant Sanchez informed Tread Athletics through email that he was resigning from his employment. *See* **Ex. 6**.

49. In discussions after Sanchez's resignation email, Sanchez represented that he was not sure what he wanted to do next for employment, but that he had no intention of working in the baseball training industry. In reliance on Sanchez' representation that he would not be acting in violation of the non-solicitation and non-compete provisions in his employment agreement, Tread Athletics agreed to terminate his employment as of March 28, 2025, even though the 2024 Agreements require 45-days' notice.

50. In terminating their employment, Tread Athletics reminded each of the Employee Defendants of their contractual obligations to the Company and instructed them to (a) cease engaging the Company's customer-athletes regarding their departures, and (b) stop posting content on Company-associated social media accounts.

51. Notwithstanding the Company's instructions or the Employee Defendants' stated reasons for terminating their employment, Tread Athletics came to learn that the Employee

Defendants had left the Company specifically to start Prime Performance, a competing baseball training and development company.

52. Specifically, on March 4, 2025, before the Employee Defendants resigned from Tread Athletics, Prime Performance filed its Articles of Organization with the New York State Department of State. *See* **Ex. 7**.

53. On April 2, 2025, Prime Performance registered the internet domain goprimeperformance.com.

54. Also in April 2025, Prime Performance created its Instagram account, and Employee Defendants updated their LinkedIn profiles to reflect their new roles as Co-Founders of Prime Performance. Notably, Germanowski identifies himself as Prime Performance's Chief Executive Officer. *See* **Composite Ex. 8**.

55. Employee Defendants are prominently featured on Prime Performance's Baseball Development "Staff" page, comprising three of the four listed Performance Coaches. The fourth Performance Coach, Joe Clancy, is a former client of Tread Athletics. *See* **Ex. 9**.

56. Prime Performance claims to operate a training facility in Port Saint Lucie, Florida that offers individualized training programs, in-house and remote, for the development of baseball players; however, it has not completed its training facility and currently all training conducted remotely.

57. Although now taken down, the Prime Performance website featured an 'Alumni' page that listed athlete clients along with the colleges and professional baseball teams they are affiliated with. Notably, nearly all of the athletes identified or featured on the website are either former clients of Tread Athletics or former Tread Athletics coaches themselves.

58. On or about May 24, 2025, Prime promoted its remote training business on Instagram and began offering a 12-month "Remote Pitching Plan" package for $500 per month on the Prime Performance website. *See* **Ex. 10**.

59. The Prime Performance website also includes a description of the services it claims to offer clients, which mirrors the scope of services Employee Defendants provided while employed by Tread Athletics. These services include movement evaluation, throwing assessment, strength and conditioning program, nutrition feedback, and a customized throwing program. *See* **Ex. 11**.

60. Prime Performance's Instagram posts have included videos that featured certain former Tread Athletics clients that had cancelled their agreements with Tread between March 14, 2025, when the Employee Defendants provided resignation notices, and the filing of this Complaint.

61. For example, Prime Performance published videos on Instagram in July 2025 featuring former Tread Athletics clients Chance Huff and Cole Gillis—who canceled their memberships on April 8, 2025, and May 26, 2025, respectively. In these posts, Prime Performance attributes increases in pitching velocity to its own training methods, despite the fact that both athletes achieved those improvements while training under Tread Athletics. *See* **Ex. 12**.

62. Notably, another former Tread Athletics client who Prime Performance has featured, Carson Moser, is the son of Robert and Lisa Moser, who are both listed as managing members of Prime Performance. *See* **Ex. 13**.

63. Carson Moser, who trained under Germanowski during his tenure at Tread Athletics, terminated his agreement with Tread Athletics on April 4, 2025—just four (4) days after Germanowski's final day with the Company.

64. Notably, although Performance Coaches are given the opportunity during their annual performance reviews to disclose client referrals—information for which they receive financial compensation—Germanowski failed to disclose that he had referred Carson Moser. This omission is particularly curious given that Germanowski was explicitly identified as Moser's direct referral when Moser later cancelled his membership with Tread Athletics.

65. Several athletes featured on Prime Performance's website and Instagram account, including Carson Moser, ceased training with Tread Athletics shortly after Employee Defendants resigned, and now train with Prime Performance. *See* **Ex. 14**.

66. On or around July 15, 2025, Prime filed its Application for Certificate of Authority with the Florida Department of State, Division of Corporations, inclusive of its Certificate of Good Standing from its State of Incorporation, New York. *See* **Ex. 15**.

67. The services offered by Prime Performance are in direct competition with the services offered by Tread Athletics.

68. Employee Defendants have directly solicited clients of Tread Athletics, even prominently featuring those clients on the Prime Performance website and Instagram account.

69. To date, ***at least*** twelve athlete-customers who previously trained directly with the Employee Defendants have terminated their agreements with Tread Athletics to join Prime Performance. Notably, ten of these terminations occurred in March and April 2025, following the Employee Defendants' resignations.

70. While still within their restricted period, the Employee Defendants have knowingly, intentionally, and without justification interfered with Tread Athletics' business relationships with its clients, acting for the benefit of themselves and Prime Performance, to the detriment of Tread Athletics.

71. Similarly, Prime Performance has knowingly, intentionally, and without justification interfered with Tread Athletics' contractual relationships with Employee Defendants, acting for the benefit of itself, to the detriment of Tread Athletics.

72. Tread Athletics has already suffered—and continues to suffer—substantial financial losses directly caused by the Defendants' conduct. These losses are ongoing, quantifiable, and stem specifically from the Defendants' breaches of contract and tortious interference, making them both measurable and legally attributable.

73. Tolling of the Employee Defendants' restrictive covenants is warranted under the 2024 Agreements to allow Tread Athletics the competition-free and solicitation-free periods that were intended because they have all breached and are continuing to willfully breach the terms of their restrictive covenants.

**COUNT I**
**BREACH OF CONTRACT**
**(Against Employee Defendants)**

74. Tread Athletics repeats and reasserts each and every allegation contained in paragraphs 1-73 of this Verified Complaint, as though fully set forth herein.

75. Employee Defendants entered into enforceable Employment Agreements, as set forth above, wherein they agreed, among other things, (a) not to be employed by or work on behalf of any business that operates, in any capacity, in the remote baseball or softball training for pitching or hitting development industry for a period of one (1) year following their separation from employment with Tread Athletics; and (b) not to solicit clients or employees of Tread Athletics for a period of one (1) year following their separation from Tread Athletics. *See* Exhs. 1, 2, 3.

76. The Employee Defendants breached, and are still in breach, of the non-compete and non-solicit provisions of their contracts with Tread Athletics. The restrictive covenants are

designed and intended to preserve and protect Treat Athletics' legitimate and protectable business interests, including but not limited to, its substantial relationships (both existing and prospective) with Treat Athletics' customers, employees, assembled work force, and the substantial goodwill Tread Athletics has developed in connection with the foregoing relationships.

77. Defendants Sanchez, Germanowski, and Bechtel have each breached their respective 2024 Agreement by, among other things:

a. Developing and engaging in a baseball or softball training business that competes with Tread Athletics by offering remote baseball training programs in violation of the 2024 Agreements ¶ 12; and

b. Directly or indirectly soliciting or encouraging Tread Athletics' customer-athletes to leave the Company in violation of 2024 Agreements ¶ 11.

78. Each of the Employee Defendants' breaches of the 2024 Agreement is material.

79. As a direct consequence of Employee Defendants' wrongful actions, Tread Athletics has suffered and/or will continue to suffer irreparable harm, including the loss of goodwill, and financial and economic loss that at this stage is impossible to quantify precisely and therefore there is no adequate remedy at law.

80. Absent injunctive relief, each of the Employee Defendants will continue to violate his contractual obligations under the 2024 Agreements.

WHEREFORE, Tread Athletics demands the following:

(a) injunctive relief enforcing the 2024 Agreements and enjoining all conduct in violation thereof;

(b) injunctive relief prohibiting Employee Defendants from continuing to work for Prime Performance and any other business that operates in the remote baseball or

softball training for pitching or hitting development industry for the entirety of the one (1) year restricted period commencing on the date of the entry of the order, per the tolling provisions in their Agreements;

(c) actual damages flowing from the breaches; and

(d) all other remedies available at law or in equity as this Court deems just and appropriate.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(Against Employee Defendants)**

88. Tread Athletics repeats and reasserts each and every allegation contained in paragraphs 1-73 of this Complaint, as though fully set forth herein.

89. Tread Athletics had significant confidence and trust in the Employee Defendants in their capacity as Performance Coaches.

90. In light of their senior positions and duties and the trust and confidence Tread Athletics had reposed in them, Employee Defendants had a fiduciary duty during their employment to, *inter alia,* act in the best interests of Tread Athletics at all times and to not use Tread Athletics' training or materials acquired or developed by them during the course of their employment for their personal benefit and/or the benefit of Treat Athletics' competitors, like Prime Performance, and to not breach their agreements.

91. By virtue of, *inter alia*, founding, incorporating, and developing a competing business *during their employment*, before notifying Tread Athletics of their intent to resign, to enable them to induce Tread Athletics' clients to cease doing business with Tread Athletics and instead to do business with them at Prime Performance, the Employee Defendants breached their fiduciary duties to Tread Athletics.

92. As a direct and proximate result of Employee Defendants' breach of their fiduciary duties, Tread Athletics has suffered and will continue to suffer damages in an amount to be determined at trial.

93. The Employee Defendants' actions were willful and intentional, entitling Tread Athletics to punitive damages.

WHEREFORE, Tread Athletics demands the following:

(a) actual damages flowing from the Employee Defendants' breach of their fiduciary duties; and

(b) all other remedies available at law or in equity as this Court deems just and appropriate.

**COUNT III**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against Employee Defendants)**

94. Tread Athletics repeats and reasserts each and every allegation contained in paragraphs 1-73 of this Complaint, as though fully set forth herein.

95. Tread Athletics maintained valuable and ongoing business relationships with its athlete-clients, including those enrolled in its remote training programs.

96. These relationships were built through years of investment in proprietary training systems, personalized coaching, and the development of goodwill and trust.

97. Employee Defendants were employed by Tread Athletics as Performance Coaches and, in that capacity, were entrusted with confidential business information, proprietary training methodologies, and direct access to Tread Athletics' athlete-clients.

98. Through their employment, the Employee Defendants gained intimate knowledge of Tread Athletics' client base, including client preferences, training plans, and contractual terms.

99. Without justification, and in violation of their Employment Agreements, the Employee Defendants used this insider knowledge to induce Tread Athletics' athlete-clients to refrain from continuing their business relationships with Tread Athletics.

100. Specifically, the Employee Defendants solicited and diverted at least twelve athlete-clients to Prime Performance, a competing business they co-founded immediately following their resignations from Tread Athletics.

101. These clients would have remained with Tread Athletics but for the Employee Defendants' unjustified interference.

102. The Employee Defendants' actions were intentional, unjustified, and undertaken with full knowledge of the harm they would cause to Tread Athletics' business.

103. As a direct and proximate result of the Employee Defendants' tortious interference, Tread Athletics has suffered substantial damages, including the loss of client relationships, goodwill, and revenue.

104. The Employee Defendants' actions were willful and intentional, entitling Tread Athletics to punitive damages.

WHEREFORE, Tread Athletics demands the following:

(a) actual damages flowing from the Employee Defendants' tortious interference; and

(b) all other remedies available at law or in equity as this Court deems just and appropriate.

**COUNT IV**
**<u>TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS</u>**
**(Against Prime Performance)**

105. Tread Athletics repeats and reasserts each and every allegation contained in paragraphs 1-73 of this Verified Complaint, as though fully set forth herein.

106. Tread Athletics has valid, enforceable and advantageous contractual relationships with the Employee Defendants, and the Agreements the Employee Defendants entered into with Tread Athletics contain restrictive covenants, including non-competition, non-solicitation and confidentiality provisions. *See* Exhs. 1, 2, 3.

107. Prime Performance—founded by the Employee Defendants, each of whom signed multiple Employment Agreements with Tread Athletics containing identical restrictive covenants, is fully aware of the Employee Defendants' contractual obligations prohibiting competition and solicitation. Despite this knowledge, Prime Performance actively solicited Tread Athletics employees, knowing they were bound by agreements that expressly barred employment with a competitor for one (1) year following separation from the Company.

108. Prime Performance knows that the Employee Defendants are violating their Agreements with Tread Athletics by working for it, and that Tread Athletics has an advantageous contractual relationship with each of them. Prime Performance is fully aware of the Employee Defendants' Agreements, which prohibit them from competing with Tread Athletics by, *inter alia,* accepting employment with direct competitors, such as Prime Performance, and soliciting Tread Athletics' clients. Prime Performance is benefitting from the Employee Defendants' actions and incentivizing them to breach their Agreements through compensation and other benefits.

109. Prime Performance intentionally and unjustifiably interfered with Tread Athletics' contractual relationships with the Employee Defendants by inducing them to and/or assisting them in breaching their restrictive covenants by leaving Tread Athletics and commencing work at Prime Performance, Tread Athletics' direct competitor, for Prime Performance's benefit.

110. Tread Athletics has suffered damages as a result of Prime Performance's unjustified interference.

WHEREFORE, Tread Athletics demands the following:

(a) injunctive relief preventing Prime Performance from continuing to interfere with Tread Athletics' contractual relationships;

(b) actual damages flowing from the tortious interference; and

(c) all other remedies available at law or in equity as this Court deems just and appropriate.

**COUNT V**
**UNJUST ENRICHMENT**
**(Against Prime Performance)**

111. Tread Athletics repeats and reasserts each and every allegation contained in paragraphs 1-73 of this Complaint, as though fully set forth herein.

112. Tread Athletics has devoted considerable effort and resources in creating its proprietary training systems, assembled workforce, and growing its customer base.

113. Prime Performance has derived, and will derive, substantial benefits by appropriating, unfairly, the benefit of Tread Athletics' substantial investment of time, money, and resources in its proprietary training systems, assembled workforce, and its customer base.

114. Prime Performance's unjust appropriation of Tread Athletics' efforts and investment in its workforce and customers is a benefit conferred upon Prime Performance, which Prime Performance has knowledge of.

115. Prime Performance has knowingly accepted and retained the benefits of its unjust appropriation of Tread Athletics' investment and efforts.

116. Prime Performance has provided nothing of value to Tread Athletics in connection with or in return for its unjust use and benefit of Tread Athletics' efforts and investment.

117. The circumstances are such that it would be inequitable and unjust for Prime Performance to retain the benefits it has unjustly accepted and retained at Treat Athletics' expense without paying the value thereof to Tread Athletics.

WHEREFORE, Tread Athletics demands the following:

(a) actual damages measured by the enhanced value it conferred on Prime Performance; and

(b) pre-judgment interest; and

(c) all other remedies available at law or in equity as this Court deems just and appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court for the following relief:

1. A Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction that immediately:

a. restrains and enjoins Employee Defendants from engaging in a business that competes directly with Plaintiff in remote baseball training for a period of one (1) year or such other time that the Court deem reasonable;

b. enjoins Employee Defendants from soliciting Tread Athletics' clients or prospective clients for a period of one (1) year or such other time that the Court deem reasonable;

c. enjoins Employee Defendants from otherwise violating the terms of their respective 2024 Agreements;

d. enjoins Employee Defendants from tortiously interfering with Treat Athletics' clients; and

e. enjoins Prime Performance from employing Employee Defendants and from tortiously interfering with Tread Athletics' employees and clients.

2. An award of damages, to the extent they may be calculated, for any recoverable past and future losses arising from unlawful conduct of Employee Defendants and Prime Performance.

3. An award of attorneys' fees and allowable costs and expenses incurred in connection with this action.

4. A trial by jury on all issues so triable.

5. An award of such other and further relief as this Court may deem just and proper.

## VERIFICATION

Pursuant to 28 U.S.C. §1746, Coan McAlpine does hereby state as follows:

1. I am over 21 years of age, and I am under no legal or mental disability or duress.
2. I am the Chief Executive Officer of Tread Athletics LLC ("Tread Athletics"), and I am authorized to make this declaration on behalf of Tread Athletics.
3. I hereby certify that I have read the foregoing Verified Complaint for Injunctive Relief and Damages, and that the statements set forth therein are true and accurate and based on my own personal information.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on August 18, 2025

Coan McAlpine

Coan McAlpine

Dated: August 19, 2025

Respectfully submitted,

JACKSON LEWIS P.C.
1 SE 3rd Avenue, Suite 2300
Miami, Florida 33131
Telephone: (305) 577-7600

*s/ Ryan B. Weiss*
Paul F. Penichet, Esq.
Florida Bar No. 0899380
Email: *paul.penichet@jacksonlewis.com*
Ryan B. Weiss, Esq.
Florida Bar No. 114479
Email: *Ryan.Weiss@jacksonlewis.com*

*Counsel for Plaintiff, Tread Athletics LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document is being filed on August 19, 2025 and served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*s/ Ryan B. Weiss*
Ryan B. Weiss, Esq